Mark LEWIS, Plaintiff,

v.

Eugene D. SMITH, et al., Defendants.

No. 01–0748–PHX–ROS.

United States District Court,
D. Arizona.

April 4, 2003.

James M. Jellison, Schleier Jellison & Schleier PC, Phoenix, AZ, for Plaintiff.

Michael King Goodwin, Office of Attorney General Liability Management Section, Phoenix, AZ, for Defendants.

## ORDER

SILVER, District Judge.

Pending before the Court are cross-motions for summary judgment. Plaintiff Mark Lewis is suing Defendant Board of Regents of the Universities and State Colleges of Arizona ("Board of Regents") for gender-based wage discrimination in violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1) ("EPA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff is also suing Defendant Board of Regents for unlawful retaliation in violation of the EPA and Title VII, and is suing Defendants Eugene Smith and Charli Turner Thorne for retaliation in violation of the First Amendment under 42

U.S.C. § 1983. Defendants jointly filed Defendants' Motion for Summary Judgment on June 17, 2002 [Doc. # 56]. Plaintiff filed a Response and Cross–Motion for Partial Summary Judgment on July 22, 2002 [Doc. # 62]. In addition, Plaintiff filed Motion to Strike Portions of Defendants' Statement of Facts [Doc. # 64], and Defendants filed Motion to Strike Portions of Plaintiff's Summary Judgment Papers [Doc. # 72]. In an Order dated March 31, 2003, the Court granted in part and denied in part Defendants' Motion for Summary Judgment and denied Plaintiff's Cross–Motion, promising that a written opinion would follow. This is that opinion.

## I. Factual Background

Plaintiff Mark Lewis was employed as an Assistant Coach for the Arizona State University's ("ASU") Women's Basketball Team from 1996 until his appointment was not renewed on or about April 13, 2001. PSOF ¶¶ 16–19, 214.[1] Plaintiff was an Assistant Coach for five seasons, and served under a series of five one-year appointments, subject to renewal each year. DSOF ¶ 9, Aff. of Kennedy, Exh. 4 to DSOF ¶ 3. Defendant Charli Turner Thorne ("Turner Thorne") is the Head Coach for ASU's Women's Basketball Team. PSOF ¶ 1. Turner Thorne hired Plaintiff in 1996 shortly after she herself was hired as Head Coach. PSOF ¶ 4. Defendant Eugene Smith ("Smith") became ASU Director of Intercollegiate Athletics in August 2000 and was Turner Thorne's supervisor in April of 2001. PSOF ¶ 5. Both Turner Thorne and Smith contributed to the decision not to renew Plaintiff's appointment in April 2001. PSOF ¶¶ 173, 174.

There are three Assistant Coach positions on the ASU Women's Basketball Team, two "non-restricted" positions which allow recruiting, and one "restricted" position with limited recruiting duties. DSOF ¶ 7, Aff. of Turner Thorne, Exh. 3 to DSOF, ¶ 2. In the five seasons in which Plaintiff was employed, from 1996 to 2001, the restricted coach position received a considerably lower salary than the other two assistant coach positions. Aff. of Kennedy, Exh. 4 to DSOF, ¶ 3. Though one assistant coach, Laura Hughes, has moved between the "restricted" and "non-restricted" position in different seasons, Plaintiff has always been employed as a non-restricted coach. Id. Plaintiff's salary in the 1996–97 season was slightly lower than the salary of the other non-restricted coach, a female, but his salary was higher than that of the other non-restricted coach, a female, in each of the next three years. Id. However, in 2000–01, Defendants hired a new assistant coach, Kim Gervasoni ("Gervasoni") whose annual base salary was $80,000, considerably more than Plaintiff's $63,860. Id., PSOF ¶ 96. At all times, Plaintiff was the only male on the coaching staff.

Though the parties dispute the extent of Turner Thorne's dissatisfaction with Plaintiff in previous seasons, Plaintiff and Turner Thorne had some professional difficulties in the 2000–1 season. In October 2000, for example, they had a meeting to discuss some issues regarding Plaintiff's attitude and performance. Lewis Depo at 97–98. Also, Plaintiff strongly objected to the hiring of Gervasoni. Plaintiff and Carrie Greene–Shiverdecker ("Shiverdecker"), the Coordinator of Operations for the ASU Women's Basketball Team, made up the search committee that screened applications for the assistant coach position in

---

**1.** Plaintiff's Statement of Facts are designated "PSOF" and Defendant's Statement of Facts are designated "DSOF." The facts that follow are stated in a light most favorable to Plain- tiff, and therefore citations are either to Plaintiff's SOF or uncontested portions of Defendant's SOF.

2000. PSOF ¶ 79–81. Plaintiff and Shiverdecker proceeded in the initial screening according to instructions set forth by Turner Thorne, PSOF ¶¶ 63, 66, but Turner Thorne made the ultimate decision after interviewing the final candidates. Plaintiff did not agree with the selection of Gervasoni, who had been the head coach at a community college in California, because he thought she lacked sufficient experience coaching or recruiting at the NCAA Division I level. PSOF ¶ 103.

On March 26, 2001, Plaintiff learned that Gervasoni's annual base salary was $80,000. The next day, Plaintiff visited Turner Thorne at her home and informed her that he had discovered the salary discrepancy and requested a pay raise. PSOF ¶ 187, 189. During the conversation, Plaintiff told Turner Thorne that he had lost "trust and respect" for her. Lewis Notes, Exh. 10 to DSOF; Turner Thorne Depo at 20. Turner Thorne testified that, after the March 27 conversation, she no longer felt that Plaintiff could support her or "sell" her to recruits, and she decided not to renew his appointment. PSOF ¶ 192, Turner Thorne Depo at 11–12.

Plaintiff and Turner Thorne spoke a few times in the week after March 27, and Turner Thorne indicated that Plaintiff would not get a raise, though she did not tell him his appointment would not be renewed. PSOF ¶¶ 195, 196, 204. Around this time, Turner Thorne had discussions with Smith about Plaintiff's employment status, and she made the decision, with Smith's approval, to not renew Plaintiff's appointment. PSOF ¶ 203, Smith Depo at 34–5, 41. At a meeting on April 11 between the two, Plaintiff informed Smith that he had filed a charge of wage discrimination with the EEOC. PSOF ¶ 208. On April 13, Turner Thorne met with Plaintiff and informed him that his appointment would not be renewed. PSOF ¶ 214. On April 27, 2001, Plaintiff filed his Complaint [Doc. # 1] alleging wage discrimination on the basis of sex and unlawful retaliation.

## II. Legal Standard on Summary Judgment

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), Jesinger v. Nev. Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see Jesinger, 24 F.3d at 1130. In addition, the dispute must be genuine, that is, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505.

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir.1995). There is no issue for trial unless there is sufficient evidence favoring the non-moving party; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249–50,

106 S.Ct. 2505. However, because "[c]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions, not those of a judge, ... [t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *see Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995).

### III. Plaintiff's Wage Discrimination Claims

#### A. Legal Standards Under the Equal Pay Act and Title VII

The EPA prohibits discrimination "on the basis of sex by paying wages to employees ... at a rate less than the rate at which [the employer] pays wages to employees off the opposite sex ... for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions..." 29 U.S.C. § 206(d)(1). For purposes of comparison, "the jobs need not be identical, but they must be 'substantially equal.' " *Stanley v. University of Southern Cal.,* 13 F.3d 1313, 1321 (9th Cir.1994) (*Stanley I* ) (quoting *Hein v. Oregon College of Educ.,* 718 F.2d 910, 913 (9th Cir.1983)). Furthermore, "[e]ach of these components [skill, effort, and responsibility] must be substantially equal to state a claim." *Stanley I,* 13 F.3d at 1321.

The Ninth Circuit has outlined a burden-shifting framework in EPA cases. Initially, "the plaintiff has the burden of establishing a prima facie case of discrimination by showing that employees of the opposite sex were paid different wages for equal work." *Stanley v. Univ. of Southern Cal.,* 178 F.3d 1069, 1073–4 (9th Cir.1999) (*Stanley II* ). At this stage, "[t]he prima facie case is limited to a comparison of the jobs in question, and does not involve a comparison of the individuals who hold the jobs." *Stanley II,* 178 F.3d at 1074. The plaintiff thus bears the burden of showing that his job was "substantially equal" to a job with a higher pay rate. A plaintiff may do this by showing "the jobs to be compared have a 'common core' of tasks, i.e., [that] a significant portion of the two jobs is identical." *Stanley, II,* 178 F.3d at 1074 (quoting *Brobst v. Columbus Services Int'l,* 761 F.2d 148, 156 (3d Cir.1985)). Once the plaintiff establishes this "common core of tasks," the inquiry shifts and "the court must then determine whether any additional tasks, incumbent on one job but not the other, make the two jobs 'substantially different.' " *Stanley II,* 178 F.3d at 1074. *See also Fallon v. Illinois,* 882 F.2d 1206, 1209 (7th Cir.1989) (outlining "common core" approach).

Once the plaintiff establishes a prima facie case, "the burden of persuasion shifts to the employer to show that the disparity is permitted by one of the four statutory exceptions to the Equal Pay Act." *EEOC v. Maricopa County Community College Dist.,* 736 F.2d 510, 513 (9th Cir.1984). The fourth statutory exception, the only one at issue in this case, is "differential based on any other factor other than sex." *Maricopa County,* 736 F.2d at 513; 29 U.S.C. § 206(d)(1). If the defendant meets this burden, "the employee may prevail by showing that the employer's proffered nondiscriminatory reason is a 'pretext for discrimination.' " *Stanley II,* 178 F.3d at 1076 (quoting *Maxwell v. City of Tucson,* 803 F.2d 444, 446 (9th Cir.1986)). At this stage, the plaintiff "bears the burden of demonstrating a material fact regarding pretext in order to survive summary judgment." *Stanley II,* 178 F.3d at 1076 (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

■ Equal Pay Act claims are also cognizable as disparate treatment claims under Title VII. As the Ninth Circuit has explained, "Title VII and the Equal Pay Act overlap because both make unlawful differentials in wages on the basis of a person's sex." *Maxwell,* 803 F.2d at 446. The analysis of a disparate treatment claim under Title VII is governed by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination, then the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. *See Llamas v. Butte Cmty. Coll. Dist.,* 238 F.3d 1123, 1126 (9th Cir. 2001). In order to prevail, the Plaintiff must then show that the employer's purported reason for the adverse employment action is merely a pretext for a discriminatory motive. *Id.*

The plaintiff's prima facie case requires a showing that "give[s] rise to an inference of unlawful discrimination." *Id.* (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089). The plaintiff may establish a prima facie case by presenting direct evidence of discriminatory intent. *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1220 (9th Cir. 1998); *see also Tempesta v. Motorola, Inc.,* 92 F.Supp.2d 973, 979–980 (D.Ariz. 1999). Alternatively, a plaintiff can establish a prima facie case circumstantially, by meeting the four requirements outlined in *McDonnell Douglas:* the plaintiff (1) is a member of a protected class, (2) performed according to the employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than other employees similarly situated. *See Chuang v. Univ. of Cal. Davis, Bd. of Trustees,* 225 F.3d 1115, 1123 (9th Cir.2000) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). Finally, "[t]he requisite degree of proof necessary to establish a prima facie case for Title VII … claims on summary judgment is minimal and does not need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994).

"Once a prima facie case has been made, the burden of production shifts to the defendant, who must offer evidence that the adverse action was taken for other than impermissibly discriminatory reasons." *Wallis,* 26 F.3d at 889. The burden then shifts back to the plaintiff to show that the employer's stated reason is a pretext. *See Godwin,* 150 F.3d at 1220 (9th Cir.1998). At the pretext stage, "[w]hen the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Id.* at 1221. However, where plaintiff relies on indirect evidence to show that the defendant's stated motive is not the actual motive, "[s]uch evidence … must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate on the basis of sex." *Id.* at 1222.

## B. Substantial Equality under the EPA

■ Plaintiff does not establish a prima facie case under the Equal Pay Act because he does not show that his job and Gervasoni's job were substantially equal in terms of skill, effort, and responsibility. In fact, one of Plaintiff's principal arguments is that he performed additional and more valuable duties, including off-campus recruiting, that Gervasoni did not. The evidence shows that Plaintiff exercised substantially different levels of effort and responsibility than Gervasoni, and therefore, he cannot establish a prima facie case of substantially equal work.

First, Plaintiff engaged in significantly more off-campus recruiting than Gervasoni in 2000–1; Gervasoni testified that she did "zero" off-campus recruiting, and estimated that Plaintiff did about "ninety percent" of it. Gervasoni Depo at 88. In particular, Gervasoni did not send out or help prepare most letters, and did not travel to do home visits. *Id.* at 71.[2] Furthermore, the additional responsibility required additional effort by Plaintiff, because "[i]f there was someone that needed to travel, he would be the one [who] would travel [to recruit]." *Id.* at 82. Plaintiff also had more responsibilities dealing with the medical staff and with "compliance" issues. *Id.* at 72, 76. In contrast, Plaintiff engaged in almost no advance scouting, while Gervasoni did scouting for every second game. Turner Thorne Depo at 76, Gervasoni Depo at 58, 71. Overall, Plaintiff and Gervasoni exercised highly different levels of responsibility and effort in the 2000–1 season.

In support of his EPA claim, Plaintiff points out similarities in the two coaching positions. Both Plaintiff and Gervasoni's positions were identically titled on the 2000–1 notice of appointment, and Turner Thorne did not rank her coaches in any hierarchical order. Aff. of Kennedy, Exh. 4 to DSOF, Exh. B, C; Turner Thorne Depo at 78–9. Plaintiff contends that the official job descriptions for each position were similar, though the descriptions submitted into evidence, *see* Exh. S, T to PSOF, do not specify many overlapping duties. Both Plaintiff and Gervasoni shared in coaching on both offense and defense, and Gervasoni testified that other responsibilities, such as public relations, fund-raising, and strength and conditioning training, were about equal. Gervasoni Depo at 28, 72–74. However, as noted above, Gervasoni also testified that many material portions of their responsibilities were *unequal.* While the evidence may show some "common core" of tasks between the two positions, Plaintiff's own evidence establishes that the two Assistant Coaches had substantially different levels of responsibility and effort regarding the very significant duties of off-campus recruiting, scouting, and dealings with the medical staff. *See Stanley II,* 178 F.3d at 1074.

Because the two positions were not substantially equal, Plaintiff cannot prevail on his equal pay claim under the Equal Pay Act.

## C. Title VII

■ Plaintiff can establish a prima facie case under Title VII because he can show a genuine issue of material fact that he was given greater or similar responsibilities but paid less than Gervasoni, who occupied a similar, if not substantially equal, position. Plaintiff does not need to show substantial equality to pursue a Title VII claim. Title VII contains a broader prohibition on discriminatory wages than that mandated by the Equal Pay Act. *County of Washington v. Gunther,* 452 U.S. 161, 170–1, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981); *Maxwell,* 803 F.2d at 446, n. 5; *see also Bartelt v. Berlitz School of Languages of America, Inc.,* 698 F.2d 1003, 1006 ("Title VII's statutory scheme covers claims of sex-based wage discrimination, whether or not those claims fall under the Equal Pay Act"). However, the Plaintiff bears a higher burden at the prima facie stage of a Title VII claim; he must show some evidence of intentional discrimination

---

2. Gervasoni also contended that Plaintiff was "territorial" about his duties, and would not allow Gervasoni to help him in his areas of responsibility. Gervasoni Depo at 75. This testimony is not relevant to Plaintiff's EPA claim, because he cannot show substantial equality of responsibility or effort, though it may be relevant to Plaintiff's Title VII claim.

in addition to evidence of a wage disparity for similar work. In *Spaulding v. University of Washington*, 740 F.2d 686, 700–1 (9th Cir.1984), *overruled on other grounds, Atonio v. Wards Cove Packing Co.*, 810 F.2d 1477 (9th Cir.1987) (*en banc*), the Ninth Circuit held that plaintiffs failed to prove substantial equality of jobs under the Equal Pay Act, but were able to state a claim for disparate treatment under Title VII. The Court also held that, at the prima facie stage, "[w]e will not ... infer intent merely from the existence of wage differences between jobs that are only similar.... The comparability of the jobs, however, can be relevant to determining whether we can infer discriminatory animus.... The plaintiff must still ultimately prove intent to discriminate to make out a case of disparate treatment." *Id.* at 700–01. *See also Forsberg v. Pacific Northwest Bell Telephone Co.*, 840 F.2d 1409, 1418–9 (9th Cir.1988) (in case where plaintiff did not show substantial equality, holding that plaintiff could still state a Title VII disparate treatment claim where plaintiff provided circumstantial evidence of discriminatory intent). Therefore, to establish a prima facie case under Title VII, Plaintiff must show some circumstantial evidence of discriminatory intent.[3]

█ Plaintiff presents sufficient evidence to establish a prima facie case. Plaintiff's job responsibilities, while not substantially equal as a matter of law, were similar to the responsibilities of the other Assistant Coach position. In fact, Defendant paid Plaintiff a wage comparable to the other Assistant Coach the three years prior to the 2000–1 season. In addition, Plaintiff presents substantial evidence that Defendant used discriminatory criteria in selecting Gervasoni for the Assistant Coach position in 2000. Not only can Plaintiff show that he was paid less than the other Assistant Coach, he has offered evidence that Defendant was determined to offer the other, higher-paying position to a woman.

Plaintiff's evidence shows that Defendant manifested its discriminatory intent by systematically screening out all male candidates from consideration for the Assistant Coach position that Gervasoni was awarded. When resumes were screened for the Assistant Coach position, Turner Thorne indicated a preference for "competitive experience with the Division I–A women's basketball level." Turner Thorne Depo at 81; Exh. K to PSOF. Turner Thorne admitted during deposition that "competitive experience" was meant to be "actual playing experience." *Id.* at 82. In fact, Shiverdecker testified that she interpreted the qualification of "competitive experience" as actual playing experience in women's basketball. Shiverdecker Depo. at 14. Generally, men do not have experience playing women's basketball, and, indeed, no male applicants advanced to the interview stage. Turner Thorne Depo at 83; Exh. M to PSOF. Defendants, in their Motion to Strike, concede that " 'competitive experience' ... *was* interpreted here to mean playing experience," and that "the qualification as applied had a disparate impact on male candidates." Def's Mot. to Strike at 4 (emphasis added). Viewed in the light most favorable to Plaintiff, there

---

3. Other circuits have adopted a similar framework for proof of Title VII gender-based wage discrimination claims. *See, e.g., Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526–28 (11th Cir.1992) ("Under the disparate treatment approach of Title VII, however, there is a relaxed standard of similarity between male and female-occupied jobs, but a plaintiff has the burden of proving an intent to discriminate on the basis of sex...."). There is, however, a circuit split on the level of proof required to state a claim. *See Miranda*, 975 F.2d at 1536 (Dubina, J., concurring) (describing circuit split and noting that Ninth Circuit follows same *McDonnell Douglas/Burdine* analysis as Eleventh Circuit).

is at least some evidence of discriminatory intent to exclude men in hiring for the position.[4]

In general, evidence of discriminatory acts by a supervisor may be relevant to determine a supervisor's intent in a particular instance. *See, e.g., Heyne v. Caruso,* 69 F.3d 1475, 1479 (9th Cir.1995) ("an employer's conduct tending to demonstrate hostility towards a certain group is both relevant and admissible where the employer's general hostility towards that group is the true reason behind firing an employee who is a member of that group"). In this case, the evidence suggests that Defendant engaged in a discriminatory process to hire an Assistant Coach who was then paid more than Plaintiff. In fact, the Staff Request form that lists "competitive experience" as a qualification contemplates a higher salary, listing a range of $60,000 to $80,000. Exh. K to PSOF. Defendants have moved to strike all evidence relating to Gervasoni's hiring, claiming that it is inadmissible under Fed R. Evid. 403 and 404. Def's Mot to Strike at 1–5. Defendants' argument fails, however, because the evidence is probative of discriminatory motive in the hiring of the person who was actually paid more than Plaintiff. The evidence is directly relevant to the question of discriminatory intent, and is not unfairly prejudicial to Defendants. The Motion to Strike will be denied.

The hiring evidence is admissible, and Plaintiff presents circumstantial evidence of gender discrimination in the difference between his salary and Gervasoni's salary in 2000–1.

■ To rebut Plaintiff's prima facie case, Defendant asserts a gender-neutral justification for Gervasoni's salary. Defendant asserts a "market forces" defense under the "factor other than sex" exception to the Equal Pay Act. Though Defendant's justification is directed at the Equal Pay Act claim, it is equally viable as a defense to Plaintiff's Title VII claims. "Title VII incorporates the Equal Pay Act defenses, so a defendant who proves one of the defenses cannot be held liable under either the Equal Pay Act or Title VII." *Maxwell,* 803 F.2d at 446. *See Gunther,* 452 U.S. at 168, 101 S.Ct. 2242 (holding that Title VII incorporates statutory EPA defenses). Therefore, if Defendant's justification is valid under the Equal Pay Act, it will suffice as a defense to the Title VII claim.

■ Defendant contends that Gervasoni was paid more because the market for her services was more competitive, and Gervasoni needed a higher salary to lure her away from a head coaching job in California. Turner Thorne testified that she obtained a higher salary for Gervasoni to convince her to leave California. Turner Thorne Depo at 22. Gervasoni had told her that she was making $72,000 to $74,000 a year at her previous job and that she needed $75,000 to $80,000 to support a move to Arizona and to establish a second residence so that her husband could keep his job in California. Gervasoni Depo at 19–20. Therefore, Defendant claims paying her more in order to overcome the "market demand" for her services was justified.

Defendant's evidence is insufficient to establish a "market forces" defense under Ninth Circuit precedent, because Defen-

---

4. Whether or not the qualifications used in the hiring process state an independent cause of action against Defendants is not before the Court, and the Court expresses no opinion on that matter. Evidence of discrimination need not be independently actionable to be relevant and admissible. *See National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2072, 153 L.Ed.2d 106 (2002) (other acts of discrimination admissible as background evidence).

dant has not established that the market value of Gervasoni's *skills* was higher than the value of Plaintiff's skills. The Ninth Circuit has held that an employer can use the prior salary of an employee to determine the employee's new salary level as long as "the employer [uses] the factor reasonably in light of the employer's stated purpose as well as its other practices." *Kouba v. Allstate Ins. Co.,* 691 F.2d 873, 876–7 (9th Cir.1982). In *Kouba,* however, the Ninth Circuit reserved the question of whether higher prior salary alone can be used to show that the market demand for an individual is higher and a pay disparity is justified. *See Kouba,* 691 F.2d at 877 n. 5. In *Stanley I,* the Court indicated that the market demand must be related to the employee's skills. "An employer may consider the marketplace value *of the skills* of a particular individual when ·determining his or her salary. Unequal wages that reflect market conditions of supply and demand are not prohibited by the EPA." *Stanley I,* 13 F.3d at 1322 (citing *Horner v. Mary Institute,* 613 F.2d 706, 714, (8th Cir.1980)) (emphasis added). Similarly, in *Horner,* the Eighth Circuit held that "it is our view that an employer may consider the market place value of the skills of a particular individual when determining his or her salary." *Horner,* 613 F.2d at 714.[5] In other words, merely relying on the prior salary of an employee, without analyzing the market value of the employer's skills, is insufficient to establish an equal pay defense. *See also Glenn v. General Motors Corp.,* 841 F.2d 1567, 1571 (11th

Cir.1988) (holding that prior salary alone, without consideration of skill or experience, cannot justify pay disparities); *Price v. Lockheed Space Operations Co.,* 856 F.2d 1503, 1506 (11th Cir.1988) (noting that prior salary alone is not a sufficient justification, even under *Kouba* ).

Viewing the evidence in Plaintiff's favor, Defendant does not show that Gervasoni possessed unique skills that justified hiring her at a higher salary than that of Plaintiff. In contrast, Plaintiff asserts that he had more experience and qualifications to do recruiting, an allegation supported by the disparity in off-campus recruiting duties between Plaintiff and Gervasoni in 2000–1. Without some conclusive and undisputed evidence of Gervasoni's skills, Defendant cannot, as a matter of law, justify paying her more merely because of her prior salary. Furthermore, Plaintiff's evidence of discrimination in Gervasoni's hiring presents evidence of pretext that independently creates an issue of fact regarding Defendant's prior salary defense. Defendant's Motion for Summary Judgment will be denied on the Title VII disparate treatment claim.[6]

## IV. Plaintiff's Retaliation Claims

### A. Title VII and EPA

Plaintiff is suing Defendant Board of Regents for unlawful retaliation in violation of Tile VII and the EPA. Title VII prohibits retaliation against an employee for opposing a discriminatory employment

---

**5.** In analogous circumstances, another District Court, relying on *Stanley* and *Horner,* has also concluded that an employer must justify the marketplace value of an employee's skills when relying upon the employee's previous salary as a defense. *See Dubowsky v. Stern, Lavinthal, Norgaard & Daly,* 922 F.Supp. 985, 993 (D.N.J.1996) ("A court should not accept a 'market forces' defense unless the employer can rationally explain the use of market infor-

mation. Previous salary is a legitimate consideration when determining the market value of an individual's skills.").

**6.** Plaintiff's Cross–Motion for Summary Judgment on the Title VII claim will be denied as well, because genuine issues of material fact remain regarding whether or not Defendant intentionally discriminated against him on the basis of gender.

practice. To prevail on a Title VII retaliation claim, a plaintiff must establish a prima facie case, showing that (1) he engaged in a protected activity, (2) he suffered an adverse employment decision, and (3) there exists a causal link between the protected activity and the adverse employment decision. *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 891 (9th Cir.1994). Once a plaintiff sets forth a prima facie retaliation case, the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for its decision. *Ray v. Henderson,* 217 F.3d 1234, 1240 (9th Cir.2000). If the defendant can articulate such a reason, the burden shifts back to the plaintiff to show that the reason was a pretext for a discriminatory motive. *Id.* To show retaliation under the EPA, 29 U.S.C. § 215(a)(3), (codified as part of the Fair Labor Standards Act), the plaintiff must show a similar prima facie case. A plaintiff must show that he communicated the substance of his allegation of illegal conduct to his employer to show he engaged in a "protected activity." *Lambert v. Ackerley,* 180 F.3d 997, 1007–8 (9th Cir.1999) (*en banc*). Furthermore, when an employer asserts that the employment decision was based on proper, unprotected reasons, "a plaintiff must show that her protected activities were a 'substantial factor' in the complained of employment action. Protected activities are a 'substantial factor' where the adverse actions would not have been taken 'but for' the protected activities." *Knickerbocker v. City of Stockton,* 81 F.3d 907, 911 (9th Cir.1996).[7]

### 1. Eleventh Amendment Immunity

■ As an initial matter, Defendant Board of Regents argues that it is immune from suit for Title VII and EPA retaliation claims because it is shielded by state sovereign immunity derived from the Eleventh Amendment. The Ninth Circuit holds that Eleventh Amendment issues must be decided before proceeding to the merits, and therefore the Court must first analyze whether the state defendants are immune under the Eleventh Amendment. *See Cardenas v. Anzai,* 311 F.3d 929, 934 n. 2 (9th Cir.2002) ("We have concluded, however, that we may not bypass the [Eleventh Amendment] issue in favor of deciding the case on the merits."), *In re Jackson,* 184 F.3d 1046, 1048 (9th Cir. 1999) ("[W]e must first resolve [the Eleventh Amendment] issue before we reach the merits of this case.").

The principle of state sovereign immunity is derived from Eleventh Amendment of the Constitution, which reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." The Supreme Court has long interpreted the Eleventh Amendment to grant a state immunity from suit from its own citizens as well. *See Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 54, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (explaining history). A state is immune from suit, unless Congress validly abrogates the state immunity, or the state waives the immunity by consenting to suit. *See College Savings Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (explaining the "only two circumstances in which an individual may sue a State"). Congress may validly abrogate state sovereign immunity only when acting pursuant to its power under the § 5 of the 14th

---

7. In their papers, the parties assume that the same legal standards apply for determining the existence of a retaliation claim under Title VII and the EPA/FLSA, and the Court *sua* *sponte* finds no reason why Plaintiff's claims should be successful under one statute but not the other.

Amendment. *See Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (Congress may abrogate state sovereign immunity under 14th Amendment), *Seminole Tribe,* 517 U.S. at 59, 116 S.Ct. 1114 (§ 5 of 14th Amendment is the exclusive Congressional authority to abrogate state sovereign immunity).

Defendants cite no direct precedent that Title VII retaliation claims against state defendants are barred by the Eleventh Amendment, and the weight of authority is to the contrary.[8] The Ninth Circuit has broadly held that Congress abrogated Eleventh Amendment immunity with respect to Title VII claims. *See Cerrato v. San Francisco Comm. Coll. Dist.,* 26 F.3d 968, 976 (9th Cir.1994). In *Fitzpatrick,* 427 U.S. at 447–48, 96 S.Ct. 2666, the Supreme Court held that Congress validly abrogated state sovereign immunity in authorizing Title VII gender discrimination suits for backpay awards, though the Court did not expressly consider retaliation claims. Most recently, in *Hibbs v. Department of Human Resources,* 273 F.3d 844, 857 (9th Cir.2001), *cert. granted,* 536 U.S. 938, 122 S.Ct. 2618, 153 L.Ed.2d 802 (2002), the Ninth Circuit held that "[b]ecause state-sponsored gender discrimination is presumptively unconstitutional, section 5 legislation that is intended to remedy or prevent gender discrimination is presumptively constitutional."[9]

However, Defendants argue that the Supreme Court's recent decisions in *Kimel v. Florida Board of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) and

*Board of Trustees of Univ. of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001) require reconsideration of whether retaliation claims against state defendants are indeed barred by the Eleventh Amendment. *Kimel* and *Garrett* held that particular laws prohibiting discrimination on the basis of age and disability, respectively, exceeded Congressional power under § 5 of the Fourteenth Amendment, and therefore did not abrogate state sovereign immunity. *See Kimel,* 528 U.S. at 91, 120 S.Ct. 631 (addressing Age Discrimination in Employment Act); *Garrett,* 531 U.S. at 374, 121 S.Ct. 955 (addressing Title I of Americans with Disabilities Act). *But see Hason v. Medical Bd. of Cal.,* 279 F.3d 1167, 1170–1 (9th Cir.2002) (holding that, despite *Garrett,* Congress abrogated state sovereign immunity under Title II of Americans with Disabilities Act). Following *Kimel,* Garrett, and other recent cases, Congress may exercise its § 5 power to prohibit discrimination that is itself unconstitutional under the Fourteenth Amendment, and to regulate otherwise constitutional conduct through legislation that exhibits "congruence and proportionality between the injury to be prevented or remedied and means adopted to that end." *Garrett,* 531 U.S. at 365, 121 S.Ct. 955 (quoting *City of Boerne v. Flores,* 521 U.S. 507, 520, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)).

A number of courts have reconsidered, in light of these recent Supreme Court decisions, whether Congress validly abrogated the states' Eleventh Amendment im-

---

**8.** Again, the parties do not distinguish between the Title VII and EPA retaliation claims in their Eleventh Amendment arguments. The Court finds no analytical difference between the two provisions, and clearly they both prohibit retaliation for complaints of intentional (and unconstitutional) gender discrimination.

**9.** The Supreme Court is currently reviewing the Ninth Circuit's decision in *Hibbs,* which held that the family sick leave provision of the Family Medical Leave Act, 29 U.S.C. § 2612(a)(1)(C), validly abrogated states' Eleventh Amendment immunity. Though the analysis of gender discrimination in *Hibbs* supports and informs the Court's decision in this case, the Court need not rely on *Hibbs* to reach its decision.

munity in enacting Title VII. These courts have concluded that Title VII, including the retaliation provision, does indeed abrogate state sovereign immunity. *See Warren v. Prejean,* 301 F.3d 893, 899 (8th Cir.2002) (holding that "the retaliation provision of Title VII is an adequate exercise of Congress' authority under section 5 of the Fourteenth Amendment"); *Nelson v. Kansas,* 220 F.Supp.2d 1216, 1220–1 (D.Kan.2002) (Congress properly abrogated Eleventh Amendment immunity in regard to retaliation provisions of Title VII). *See also Nanda v. Board of Trustees of Univ. of Ill.,* 303 F.3d 817 (7th Cir.2002) (holding generally that Congress validly abrogated state immunity in enacting Title VII); *Okruhlik v. University of Ark.,* 255 F.3d 615 (8th Cir.2001) (holding same). After reviewing the cases and the parties' arguments, the Court concurs that states are not immune from Title VII and EPA retaliation suits.

Under *Kimel* and *Garrett,* the Court must first analyze the scope of the constitutional right which the statute seeks to remedy. Unlike classifications based on age and disability, which are subject only to rational basis review and unconstitutional only if irrational, gender classifications by a state actor are subject to an intermediate scrutiny standard. *See United States v. Virginia,* 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (state-sponsored gender discrimination unconstitutional unless it "serves important government objectives and … the discriminatory means employed are substantially related to the achievement of those objectives"). As the Ninth Circuit has explained, "[t]his allocation of the burden of proof has the effect of creating a rebuttable presumption of unconstitutionality for state-sponsored gender discrimination." *Hibbs,* 273 F.3d at 855. Further, in *Kimel,* the Supreme Court noted that government action based on gender differences can be characterized as "so seldom

relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy." *Kimel,* 528 U.S. at 83, 120 S.Ct. 631 (quoting *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)).

Because of the generally recognized and presumptively unconstitutional nature of gender discrimination by state actors, it is not necessary, as Defendants contend, *see* Reply at 9, to examine the legislative record of Title VII for evidence of such discrimination. In *Kimel,* the Court reiterated that it has found a "history of purposeful unequal treatment" on the basis of gender, in contrast to discrimination on the basis of age. *Kimel,* 528 U.S. at 83, 120 S.Ct. 631 (citations omitted). Further as the Eighth Circuit noted, Congress has made numerous legislative findings concerning gender discrimination by the states. *Warren,* 301 F.3d at 899 (stating further that "parsing of the legislative findings with regard to Title VII [retaliation claims] is unnecessary"). *See also Nanda,* 303 F.3d at 830 (examining legislative history of gender discrimination). Congress and the Supreme Court have already clearly identified the injury of gender discrimination by the state and the Court need not investigate further. *Accord Nelson,* 220 F.Supp.2d at 1221 ("defendant's argument that the legislative history is inadequate to support the remedies for gender discrimination found in Title VII, can be dismissed without reviewing thousands of pages of legislative history").

Title VII's retaliation provision is thus valid under § 5 of the Fourteenth Amendment if it exhibits "congruence and proportionality between the injury to be prevented or remedied and means adopted to that end." *Garrett,* 531 U.S. at 365, 121 S.Ct.

955. Congress may regulate conduct not strictly prohibited by the Fourteenth Amendment through "prophylactic legislation," but it may not "effect[ ] a substantive redefinition of the Fourteenth Amendment right at issue." *Kimel,* 528 U.S. at 81, 120 S.Ct. 631. For example, the Eleventh Circuit has upheld disparate impact claims against states, even though proof of intentional discrimination is not an element of a disparate impact claim, because it is a "preventive rule[ ]" which targets the "core injury" of intentional discrimination. *In re Employment Discrimination Litigation Against the State of Alabama,* 198 F.3d 1305, 1322 (11th Cir.1999) (quoting *City of Boerne,* 521 U.S. at 530, 117 S.Ct. 2157). Some conduct prohibited by the retaliation provision is itself unconstitutional, since a retaliatory discharge may also be motivated by discriminatory motives. However, the retaliation provision regulates more than just unconstitutional conduct, because it prohibits actions which may be intended to deter complaints of discrimination, but which may have no independent discriminatory intent.

Title VII's retaliation provision is a remedy necessary to effectuate the statute's prohibition of intentional discrimination, because it protects employees who complain of violations of the law. Specifically, it is narrowly aimed at preventing state actors from deterring such complaints. Title VII relies on employees to bring complaints in order to initiate legal action, and requires employees to utilize an administrative process with the EEOC so that the grievance against an employer can be investigated and resolved. *See* 42 U.S.C. § 2000e–5(e)–(f). *See also Blank v. Donovan,* 780 F.2d 808, 809 (9th Cir.1986)

(one purpose of Title VII is "to provide an opportunity to reach a voluntary settlement of an employment discrimination dispute"). If employers could terminate employees upon learning of the grievance, employees would be significantly deterred from bringing complaints, a fact which the Ninth Circuit has recognized in tailoring the scope of cognizable retaliation claims to track the statute's anti-deterrent purpose. In *Ray,* 217 F.3d at 1242–43, the Ninth Circuit adopted a definition of an adverse employment action as one that "is reasonably likely to deter employees from engaging in protected activity." As the Court explained, "[i]nstead of focusing on the ultimate effects of each employment action, the [above] test focuses on the deterrent effects. In so doing, it effectuates the letter and purpose of Title VII." *Id.* at 1243. *See also Heuer v. Weil–McLain,* 203 F.3d 1021, 1023 (7th Cir.2000) (explaining that "the very purpose of the anti-retaliation provision is to prevent Title VII claims from being deterred"). Without the retaliation provision, employees fearful of losing their jobs might not bring a complaint, thereby giving up a core constitutional and statutory protections at the heart of the Fourteenth Amendment: to be free of state-sponsored gender discrimination. Far from "effect[ing] a substantive redefinition of [a] Fourteenth Amendment right," *Kimel,* 528 U.S. at 81, 120 S.Ct. 631, the retaliation provisions are directly targeted at protecting state employees from intentional unconstitutional discrimination.[10]

The Court finds that the provisions of Title VII and the EPA prohibiting retaliation are congruent and proportional to remedying the proven harm of gender dis-

---

10. The EPA retaliation clause serves the same purpose. *Lambert,* 180 F.3d at 1004. "The FLSA's anti-retaliation clause is designed to ensure that employees are not compelled to risk their jobs in order to assert their wage and hour rights under the Act." *Id.* The scope of anti-retaliation protections under the EPA, also protecting employees who complain of gender-base wage discrimination, are no more broad than those under Title VII, and the Eleventh Amendment analysis is applicable to the EPA is well.

crimination. Therefore, Congress validly abrogated the State of Arizona's Eleventh Amendment immunity when enacting Title VII and the EPA, and the Court has jurisdiction to proceed on the merits of Plaintiff's claims.

### 2. The Merits

■ Plaintiff contends that he was terminated in retaliation for exercising his rights under Title VII and the EPA by complaining about equal pay to his supervisor, Turner Thorne. Plaintiff argues that the March 27 conversation between Plaintiff and Turner Thorne in which Plaintiff complained about unequal pay constituted a "protected activity." Further, Plaintiff points out that he informed Defendant Smith that he filed an EEOC complaint on April 11, 2001, also a protected activity, two days before he was notified of his non-renewal.

As an initial matter, Plaintiff's EEOC complaint filed April 11 did constitute "protected activity," but all evidence indicates that the adverse employment decision was made *before* April 11. William Kennedy, the Assistant Athletic Director of Administrative Services, testified that he was instructed on or about April 6 to prepare a notice of non-renewal for Plaintiff. Aff. of Kennedy, DSOF, Exh. 4., ¶ 7. He sent two emails to Camille Crook, the coordinator for Human Resources, one on April 6 and one on April 10, both expressing that Crook should prepare a non-renewal notice dated April 12. *Id.* Exh. C, D. Plaintiff does not seek to impeach or controvert this evidence.

Kennedy's documentary evidence coincides with Turner Thorne's testimony that she made the decision not to renew Plaintiff's contract by the time she had a phone conversation with Plaintiff on April 3. Turner Thorne Depo at 53. During that conversation, when Turner Thorne tried to set up a further meeting with Plaintiff, he responded in essence "Why, so you guys can fire me?" *Id.* Plaintiff impliedly concedes that the decision to non-renew him had been made by April 3. PSOF ¶ 203. Once the decision to take an adverse action was made, Plaintiff's EEOC complaint was perfunctory and legally meaningless. As the Supreme Court recently stated, "Employers need not suspend previously planned [adverse actions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitely determined, is no evidence whatever of causality." *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (*per curiam*).

However, Plaintiff's opposition to the salary disparity in his March 27 meeting did constitute a "protected activity." Plaintiff presents sufficient evidence that he complained of salary disparity in his March 27 conversation with Turner Thorne. His own contemporaneous notes from that day indicated that he met with Turner Thorne "and made her aware of the fact that [he] knew the salary difference and was very dissatisfied with the situation." Exh. 10 to PSOF. He further indicates that he "[l]et her know that [he] never thought that she would hire someone at a greater salary than [himself]." *Id.* Turner Thorne's testimony regarding the conversation is consistent with Plaintiff's testimony. She indicated that Plaintiff said "he felt betrayed and that he would never agree with the reasons that [she] hired her." Turner Thorne Depo at 20. Plaintiff had lost "trust and respect" for Turner Thorne, "[b]ecause [she] hired in another assistant at a higher salary," and "[h]is belief was that if you are with somebody longer, then you deserve to make more money." *Id.* at 20–21. Plaintiff's opposition to the wage disparity constitutes a "protected" activity. *See Lambert*, 180 F.3d at 1008 ("it is clear that so long as an employee communicates the *sub-*

*stance* of his allegations to the employer (e.g., that the employer has failed to pay adequate overtime, or has failed to pay the minimum wage), he is protected by § 215(a)(3)"); *Learned v. City of Bellevue,* 860 F.2d 928, 932 (9th Cir.1988) ("the opposed conduct must fairly fall within the protection of Title VII to sustain a claim for unlawful retaliation [under Title VII]"). Further, Plaintiff did not need to invoke Title VII or the EPA in his complaints to Turner Thorne to be protected against retaliation. *See Gifford v. Atchison, Topeka & Santa Fe Railway Co.,* 685 F.2d 1149, 1157 (9th Cir.1982) ("It does not follow that the employee must be aware that the practice is unlawful under Title VII at the time of the opposition in order for opposition to be protected. It requires a certain sophistication for an employee to recognize that an offensive employment practice may represent sex or race discrimination that is against the law.").

In response, Defendant contends that Plaintiff was terminated for insubordination by complaining that he had lost "trust and respect" for Turner Thorne, rather than for complaining about his wages. Turner Thorne testified that Plaintiff's statement on March 27 that Plaintiff lacked "trust and respect" for Turner Thorne was a primary motivating factor in his non-renewal. Turner Thorne Depo at 11–12. In a mixed motive case, however, Plaintiff must merely show that the protected activity was a "substantial factor" in the retaliatory decision, not the sole factor. *Knickerbocker,* 81 F.3d at 911. *See also Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1064–5 (9th Cir.2002) (in Title VII retaliation cases, protected activity must be "one of the reasons for his firing and that but for such activity he would not

have been fired") (quotations omitted). Furthermore, as previously discussed, Plaintiff has presented evidence of discriminatory treatment in Gervasoni's hiring by the same decision-maker. This evidence is relevant to rebut Defendant's proffered non-retaliatory motive. *See Heyne,* 69 F.3d at 1479. Genuine issues of material fact remain on whether Defendant Board of Regents retaliated against Plaintiff for complaining of salary disparity. Therefore, both Defendants' Motion for Summary Judgment and Plaintiff's Cross–Motion for Summary Judgment will be denied on the Title VII and EPA retaliation claims.

**B. First Amendment Retaliation Claim under § 1983**

▇ Plaintiff also alleges that Defendants Smith and Turner Thorne violated his First Amendment rights under 42 U.S.C. § 1983, which provides a statutory mechanism for bringing constitutional claims. To state a claim pursuant to § 1983, Plaintiff must show: "(1) the conduct alleged was committed by an individual acting under color of state law; and (2) the conduct deprived the plaintiff of a federal constitutional or statutory right." *San Pedro Hotel Co. v. City of Los Angeles,* 159 F.3d 470, 479 (9th Cir.1998) (quotation omitted). "[Section] 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quotations omitted). Plaintiff alleges that Defendants violated his rights under the First Amendment by retaliating against him for speaking on a matter of public concern.[11]

---

11. Plaintiff's § 1983 claim is based upon alleged retaliation for his conversations with Defendants Turner Thorne and Smith. Plaintiff also discussed the salary situation with two other ASU employees, Sandy Hatfield–Clubb and Betsy Mosher. However, Plaintiff does not contend that these conversations are relevant to his § 1983 claim, describing them

The First Amendment restricts the state's ability to fire public employees who speak out on a matter of public concern. To prevail on a claim for unlawful retaliation under the First Amendment, "an employee must first demonstrate that the speech was 'on a matter of public concern.'" *Weeks v. Bayer*, 246 F.3d 1231, 1234 (9th Cir.2001) (quoting *Connick v. Myers*, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Courts have eschewed "rigid multi-part tests" to determine if a matter is one of public concern, and "have focused on two general aspects of speech." *Weeks*, 246 F.3d at 1234. First, the Court must look at the content of the speech, to determine if it touches upon "matter[s] of political, social, or other concern to the community." *Weeks*, 246 F.3d at 1234 (quoting *Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir.1989)). Second, the Court must examine the "form and context" of the speech, including "such factors as the public or private nature of the speech and the speaker's motive." *Weeks*, 246 F.3d at 1235 (quoting *Connick*, 461 U.S. at 147, 103 S.Ct. 1684). Once the employee establishes the public concern requirement, the Court must apply the balancing test originally set forth in *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and "determine whether the employee's interest in expressing herself outweighs her employer's interest in preventing potential disruption." *Moran v. Washington*, 147 F.3d 839, 846 (9th Cir.1998).

Because Plaintiff cannot show that he complained specifically of gender discrimination to Turner Thorne before his firing, his speech barely touched, if at all, on a matter of public concern. As discussed in the previous section, Plaintiff's complaints to Defendants focused on the qualifications of Gervasoni and whether she deserved to be paid more than Plaintiff evaluating their respective qualifications and experience. The qualifications of the assistant coach to a university basketball team are not widely regarded as matters of political or social concern to the community. Speech that questions such distinctions is not "speech that is critical to the functioning of the democratic process." *Weeks*, 246 F.3d at 1235. Nor does the speech address "issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government." *Weeks*, 246 F.3d at 1234 (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983)).

Although *Pickering*-related cases must be decided on a case-by-case basis, the Court's conclusions are guided by the Supreme Court's decision in *Connick* and the Ninth Circuit decision in *Voigt v. Savell*, 70 F.3d 1552 (9th Cir.1995). In *Connick*, an aggrieved employee circulated a questionnaire to other employees that questioned the activities of supervisors at the district attorney's office. The Supreme Court held that the questions concerning office policies and morale were not a matter of public concern, but that questions concerning pressure to participate in political campaigns did touch upon matters of public concern. The Court thus distinguished between internal personnel disputes and issues in which there is a "demonstrated interest in this country," such as a nonpoliticized district attorney's office. *Connick*, 461 U.S. at 149, 103 S.Ct. 1684. As well, in *Voigt*, the Ninth Circuit, in a case against a sitting judge, clarified that discussions of "internal personnel matters" were not matters of public concern but that complaints of discrimination against non-state residents and "unfair treatment of job applicants in general" were not al-

as "private conversations with friends." Pl's Response at 19.

ways "utterly devoid of public concern." 70 F.3d at 1560.

Further, in *Snider v. Belvidere Township*, 216 F.3d 616 (7th Cir.2000), the Seventh Circuit addressed a very similar case and held that an employee's speech did not touch on a matter of public concern. In *Snider*, the plaintiff discovered that a male township employee was being paid the same salary, and publicly complained at a township Board meeting that the salary level was unfair because she was more senior and more qualified. The Seventh Circuit noted that her complaints centered on an employment dispute, not gender discrimination. "She never complained that the males were being paid more than the females. She complained only about the fairness of her salary *vis-a-vis* other employees, given her tenure." *Id.* at 620. The Court characterized plaintiff's complaints as "related solely to a personal issue, not to a public concern. . . . She simply wanted to paid more than anyone else with less seniority. Such workplace speech, while personally important, does not address a matter of public concern, and thus does not merit First Amendment protection." *Id.* at 620. Likewise, Plaintiff's complaints related to a salary differential between himself and another coach founded on experience, not on gender. His complaints related to personal matters rather than to matters of public concern.

The Third Circuit's decision in *Azzaro v. County of Allegheny*, 110 F.3d 968 (3d Cir.1997) is not to the contrary. In *Azzaro*, the plaintiff complained of sexual harassment within the office of a public official. The Court found that complaints about gender discrimination, when the discrimination is perpetrated by an official exercising authority under a public office, touch on a matter of public concern and that "plaintiff's report of sexual harassment is constitutionally-protected speech." *Id.* at 970, 978. However, the circum-

stances here are distinguishable. First, Plaintiff has no evidence that he actually complained of gender discrimination, only that he complained that he was being paid less than someone with inferior qualifications. Second, *Azzaro* concerned actions by an employer exercising public authority, and the Court reasoned that information about discrimination "would be relevant to the electorate's evaluation of the performance of the office of an elected official," clearly a matter of public interest. *Id.* at 978. In contrast, the ASU Women's Basketball Team does not exercise public authority and its members are not elected.

Even if Plaintiff's comments touched on a matter of public concern, Defendants had a strong interest in maintaining the cohesiveness and effectiveness of the coaching staff, which outweighed any employee's interest under the *Pickering* balancing test. Turner Thorne had legitimate concerns about the ability and capacity of the coaching staff to function effectively given the status of her working relationship with Plaintiff. Plaintiff testified that one of his jobs as a recruiter was to "sell" the ASU program, and to "sell" Turner Thorne in particular. Lewis Depo at 58. Plaintiff admits that he informed Turner Thorne that he had lost "trust and respect" for her. Turner Thorne testified that she feared that such sentiments would interfere with those critical recruiting duties. Turner Thorne Depo at 11, 51, Aff. of Turner Thorne, Exh. 3 to DSOF, ¶ 19. Given these concerns, Defendants had a legitimate interest in maintaining the effective functioning of the small coaching staff. *See also Voigt*, 70 F.3d at 1561 ("The limited First Amendment interest involved here does not require that the defendants tolerate actions which they reasonably believed caused disruption in the workplace and undermined the authority of Voigt's superiors.").

Therefore, Plaintiff's speech was not protected under the First Amendment and summary judgment will be granted for Defendants on Plaintiff's § 1983 claim.[12] Because Defendants Smith and Turner Thorne were the only named Defendants on Count I, the claim under § 1983, they will be dismissed as Defendants.

## V. Motions to Strike

### A. Defendants' Motion to Strike Plaintiff's Statement of Facts

The Court has resolved that Plaintiff presents enough evidence to create a genuine issue of material fact on his Title VII and retaliation claims. To the extent that the disputed evidence is merely duplicative or cumulative of Plaintiff's other evidence, the Court need not resolve the parties' conflicts. Defendants' principal argument in their motion is that the evidence about Gervasoni's hiring process is inadmissible. This portion of the Motion to Strike is addressed in Part III. Defendants' more succinct objections follow.

1. PSOF ¶ 44: Defendants argue that information about Plaintiff's past bonuses is not relevant. While Plaintiff might use such evidence at trial, the Court need not consider it in denying summary judgment.

2. PSOF ¶ 55: Defendants argue that Plaintiff's opinion of his relationship with Turner Thorne at the end of the 2000–1 season is "self-serving" and "improper." The fact that the testimony supports Plaintiff's case is not a ground to strike the testimony. Further, Defendants give no indication why the testimony is "improper."

3. PSOF ¶ 57: Defendants argue that the newspaper article concerning the hiring of Plaintiff's replacement is hearsay. The article is not hearsay to the extent that it shows that such information appeared in the newspaper, because it is not offered to prove the truth of the matter asserted. The appearance of such issues in the newspaper is relevant to the public concern inquiry in Part IV.

4. PSOF ¶ 97: Defendants argue that this is an incomplete statement of Turner Thorne's testimony regarding whether she previously worked with Gervasoni before hiring her. Defendants are correct that Turner Thorne did testify that she "worked a camp" with Gervasoni, and therefore this statement is misleading. Turner Thorne Depo at 85.

5. PSOF ¶ 105: Defendants argue that this statement mischaracterizes Shiverdecker's testimony about screening for grammatical errors in resumes. This testimony is relevant only to the issue of whether Defendants discriminated against men in Gervasoni's hiring. The Court need not weigh this testimony because Plaintiff presents sufficient evidence on summary judgment of some discriminatory impact in Gervasoni's hiring, regardless of Gervasoni's alleged grammatical errors.

6. PSOF ¶¶ 108–111: Defendants argue that evidence about Turner Thorne's practice of running a private camp is irrelevant. Evidence about Turner Thorne's camps is relevant to the extent that Plaintiff's and Gervasoni's job responsibilities differed in regard to staffing it.

---

**12.** Because the Court determines that Defendants did not infringe on Plaintiff's First Amendment rights, Defendants' arguments that they are entitled to qualified immunity because Plaintiff's rights were not "clearly established" is moot. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *Cf. Moran,* 147 F.3d at 847 ("Because the underlying determination pursuant to *Pickering* whether a public employee's speech is constitutionally protected turns on a context-intensive, case-by-case balancing analysis, the law regarding such claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity under *Harlow* and its progeny.")

7. PSOF ¶¶ 138–9: Defendants argue that this statement misstates Gervasoni's testimony, which that she did no *off-campus* recruiting. Defendants are correct in this regard, and the Court has considered Gervasoni's own testimony on her recruiting duties, instead of Plaintiff's characterization in the SOF.

8. PSOF ¶ 149: Whether or not Gervasoni asked players about their sex lives is wholly irrelevant to Plaintiff's case, and the Court will not consider it.

9. PSOF ¶ 155: Whether or not Gervasoni yelled out during practice is also not relevant to Plaintiff's case.

10. PSOF ¶ 187, 191, 192: Defendants argue that these statement are incomplete, because they refer to one aspect of Plaintiff's March 27 conversation with Turner Thorne, but not another. Furthermore, the latter two statements liberally draw conclusions from Turner Thorne's testimony. In examining the March 27 conversation in Part IV, the Court relies on the record, not Plaintiff's characterization in the SOF.

11. PSOF ¶ 209: Defendants argue that this statement is "self-serving." This is not an objection under the Federal Rules of Evidence.

12. PSOF ¶ 224: Defendants argue that this is an incomplete statement of Shiverdecker's testimony. The Court finds that Shiverdecker's actual testimony is the most accurate statement of her position regarding whether she ever heard Turner Thorne complain about working with Plaintiff. Shiverdecker Depo at 32. However, neither party explains how the Court should apply this evidence on summary judgment.

13. PSOF ¶ 249: Defendants argue that "concealment" is an argumentative description of Turner Thorne's conduct. The Court agrees, but does not need to rely on the underlying evidence in denying summary judgment.

14. PSOF ¶ 250: Defendants argue that this statement is irrelevant and more prejudicial than probative, presumably because it deals with discrimination in Gervasoni's hiring. This evidence is relevant for the reasons previously explained in Part III.

15. PSOF ¶¶ 251–255: Defendants contend that these statements, concerning Turner Thorne's communications to Smith before Plaintiff was terminated, are "argument of counsel" and irrelevant. No party explains the relevance of these statements in their summary judgment motions, and the Court will deny summary judgment on the retaliation claim, so the Court need not consider them.

16. PSOF ¶¶ 258–263, 265–270, 272–284. These statements concern Defendants' actions to hire a new Assistant Coach subsequent to Plaintiff's non-renewal. Defendants argue that they are inadmissible as subsequent remedial measures under Fed.R.Evid. 407, and are more prejudicial than probative. Rule 407 only excludes evidence of subsequent remedial measures when offered for certain purposes, such as proving "culpable conduct," but does not require the exclusion of evidence for other, legitimate purposes. The Court, therefore, cannot strike the evidence without speculating about the purpose for which it is offered. In denying Plaintiff's summary judgment motion on retaliation and Title VII, the Court does not need to consider evidence of Defendants' later conduct to conclude that there are genuine issues of material fact. In regards to the other claims, the evidence is admissible under Rule 407 if offered to show that Plaintiff's and Gervasoni's positions were substantially equal, or that Plaintiff's complaints touched on a matter of public concern.

17. PSOF ¶ 285: Defendants argue that a comparison between the job responsibilities of Gervasoni and Joseph Anders (Plaintiff's eventual replacement) should be excluded as irrelevant. Defendants are correct because the evidence is not relevant to determining Plaintiff's level of responsibility and effort in the 2000–1 season. Plaintiff makes no contention that his level of responsibility in 2000–1 was similar to that of Anders now, or that Gervasoni's job responsibilities have not changed over time.

## B. Plaintiff's Motion to Strike Defendants' Statement of Facts

1. DSOF ¶¶ 11, 12: Plaintiff argues that these statements are based on discussions between Turner Thorne and White in the spring of 2000 about hiring a new assistant coach, which constitute inadmissible hearsay. Defendants contend that the SOF only refers to Turner Thorne and White's actions at that time, and not their actual statements. The portions of the SOF that do not rely on actual statements are not relying on hearsay. Fed. R. Evid. 801. The portions that do refer to statements made by Turner Thorne and White may be based on hearsay, though some of those statements, as Defendants contend, may be admissible under Rule 803(3). Because the Court does not rely on any statements from that meeting in resolving summary judgment, the Court need not decide whether any particular statements are admissible.

2. DSOF ¶ 28: Plaintiff argues that this description of Gervasoni's job responsibilities is not supported by Gervasoni's actual deposition testimony. In deciding the summary judgment motion, the Court's has considered this actual testimony of Gervasoni, not this summary in the SOF, so the objection is moot.

3. DSOF ¶ 29: Plaintiff argues that this description of recruiting duties is not supported by the document cited, which is a portion of Gervasoni's deposition. Indeed, this portion of Gervasoni's testimony does not support the proposition that Plaintiff and Gervasoni were "initially expected to share recruiting duties". Gervasoni's contention that Plaintiff was "territorial" is supported by this citation and other testimony. *See* Gervasoni Depo at 75.

4. DSOF ¶ 34: Plaintiff argues that this statement lacks foundation and is based on a document, Exh. D, which is inadmissible hearsay. The fact that Turner Thorne and Plaintiff met and talked about his performance is supported by Turner Thorne's affidavit. Statements made while discussing Plaintiff's job performance are hearsay if offered to prove the truth of the matter asserted, i.e., Plaintiff's actual job performance. Also, the contemporaneous notes (Exh. D) are hearsay. The Court need not determine whether the notes are admissible pursuant to some exception, because the Court need not resolve issues concerning Plaintiff's job performance on summary judgment.

5. DSOF ¶ 36: Plaintiff argues that evidence about his and Gervasoni's working relationship is not relevant and that the statement is vague. Their working relationship might be relevant at trial, but is not necessary to consider on summary judgment.

6. DSOF ¶¶ 38, 45–51: Plaintiff argues that testimony concerning his discussions with Sandy Hatfield–Clubb and Betsy Mosher are not relevant under Rules 401 and 402. As discussed in Part IV, Plaintiff does not rely on these discussions to support his First Amendment claim. However, Defendants are correct in responding that evidence about Plaintiff's workplace discussions is relevant to the Court's factual and legal analysis of issues of public

concern and the balancing test under *Pickering.*

7. DSOF ¶ 59: Plaintiff argues that this statement of fact is "misleading." The cited testimony, dealing with Smith's knowledge of Plaintiff's salary complaints and relationship with Turner Thorne, is relevant. The Court relies on the actual testimony, rather than Defendants' characterization of the facts.

8. DSOF ¶ 70: Plaintiff argues that his statement that he does not believe that his non-renewal was "because of [his] gender" is inadmissible, because the deposition question called for a legal conclusion. Lewis Depo at 177. The question merely calls for an opinion about the motive for his non-renewal. Plaintiff, however, does not assert a Title VII discrimination claim based on his non-renewal; his non-renewal claims allege unlawful retaliation, which require no showing of discriminatory intent. The statement is relevant but too vague to be useful on summary judgment.

9. DSOF ¶ 71: Plaintiff admits that he had "some issues with [Turner Thorne] besides the salary issue." Lewis Depo at 173. Plaintiff is correct in pointing out that the testimony is vague, but Plaintiff's statements about his working relationship with Turner Thorne are relevant to Defendants' motive in not renewing his appointment.

## VI. Conclusion

The Court will grant summary judgment for Defendants on Plaintiff's Equal Pay Act discrimination claim and on Plaintiff's § 1983 claim. Summary judgment will be denied on Plaintiff's Title VII disparate treatment claim and his overlapping Title VII and Equal Pay Act retaliation claims. Because genuine issues of material fact remain on these claims, Plaintiff's Cross-Motion for Partial Summary Judgment will be denied.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment [Doc. # 56] is **GRANTED IN PART** and **DENIED IN PART.** Summary judgment is granted for Defendant Board of Regents on Count II of the Second Amended Complaint. Summary judgment is granted for Defendants Eugene Smith and Charli Turner Thorne on Count I of the Second Amended Complaint, dismissing Defendants Eugene Smith and Charli Turner Thorne.

**IT IS FURTHER ORDERED** that Plaintiff's Cross–Motion for Partial Summary Judgment [Doc. # 62] is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Strike Portions of Defendants' Statement of Facts [Doc. # 64] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Portions of Plaintiff's Summary Judgment Papers [Doc. # 72] is **DENIED.**